COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| JOHN CANTU, | § | No. 08-23-00304-CR |
|---|---|---|
| Appellant, | § | Appeal from the |
| v. | § | 186th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2019CR5621) |

## MEMORANDUM OPINION[1]

Appellant John Cantu was charged with capital murder for remuneration in the shooting death of Mike Perez, but a jury acquitted him of that offense and found him guilty of the lesser-included offense of first-degree murder. The trial court sentenced Appellant to 70 years in prison and assessed a $10,000 fine. On appeal, Appellant contends (1) the trial court abused its discretion in denying his motion to suppress, (2) the trial court abused its discretion in refusing to provide the jury with an accomplice instruction, (3) the evidence was legally insufficient to support his conviction, and (4) the trial court abused its discretion in denying his motion for a mistrial. For the reasons set forth below, we affirm.

---

[1] This case was transferred from the Fourth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

# I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Carmen's testimony regarding the shooting

Mike Perez was shot to death at the home of Christina Rodriguez and Appellant's brother, Manuel Cantu (the Cantu home). The primary witness at trial was Carmen Hernandez, who lived in a garage apartment at the Cantu home for several months before the murder and babysat the couple's two children. She testified as follows at trial. Manuel and Christina were methamphetamine and heroin dealers, and Perez was a neighbor who used methamphetamine and sometimes ran drugs for the couple.[2] Carmen used methamphetamine in the weeks leading up to Perez's death but did not use the night of the murder until after the shooting.

Mike Torres was the drug operation leader and would regularly come by the Cantu home to collect money from the couple. Sometime in February 2019, Torres came to the house "very mad" and struck Christina in the face. Carmen later overheard a discussion between Christina and Manuel indicating Torres had accused them of "cutting the drugs" and they were going to blame Perez for it.[3] Their plan initially involved "beating up [Perez]." But when Manuel said he did not want to participate in the beating, Christina proposed asking Appellant to do it. Two or three days later, Carmen overheard Christina—who had apparently changed the plan—ask Appellant to kill Perez, and Appellant agreed.[4] Appellant had a gun and told Christina he needed bullets, which she agreed to supply. Christina said she was going to pay Appellant $500 for the killing.

---

[2] For clarity's sake, we use first names for some individuals and last names for others. We intend no disrespect in using either.

[3] Carmen was allowed to testify to what she heard Christina and Manuel say under the "co-conspirator" exception to the hearsay rule. *See* Tex. R. Evid. 801(e)(2)(E) (providing that a statement "made by the party's co-conspirator during and in furtherance of the conspiracy" is not hearsay). Appellant did not object to her testimony.

[4] It is not clear from Carmen's testimony if Manuel was aware of Christina's new plan.

Subsequently, on February 22, 2019, Carmen was in Christina's car with Christina and her children when Christina picked up Appellant from his house. Christina asked Appellant if he was "ready." Appellant, in response, lifted his jacket and exposed the gun on his waist. Christina went to an ATM and withdrew $500, giving it to Appellant.[5]

Christina had been "bingeing" on methamphetamine all week, and Appellant took some when they arrived at the Cantu home that afternoon. After Manuel returned home from work that night, Christina called Perez. She offered to give him drugs, and he agreed to come to the house. Manuel and Appellant were in the garage drinking when Perez arrived. Manuel, who was wearing surgical gloves, began beating Perez. Perez was unarmed; Manuel had a switchblade that he always carried with him.

Perez ran away from Manuel, making it to the outside gate of the residence, which was surrounded by a chain link fence. Carmen believed Manuel intended to let Perez leave, as Perez was already badly beaten by then. Initially, Appellant did nothing to stop Perez from leaving and was "just standing there" until Christina reminded Appellant he was being paid and asked him what he intended to do. Appellant, who was also wearing surgical gloves, ran out of the garage and started shooting at Perez.

Carmen turned her back and heard four shots fired and Perez scream. She then saw Perez on the ground just outside the gate near the sidewalk. Manuel and Appellant put Perez's body in the trunk of Manuel's car, and Manuel directed Carmen to wash the blood off the cement then get in the car with them. Carmen was in shock from the shooting, and although she wanted to leave the scene, she complied with Manuel's directions. Manuel "drove just down the street" before he and Appellant took Perez's body from the trunk, leaving it on the side of the street in what Carmen

---

[5] The State did not produce any bank records or other documentation as to the withdrawal.

3

believed was an apparent attempt to make it appear as if Perez had been robbed. Manuel then drove to a park where he and Appellant changed out of their blood-stained clothes. While there, Manuel began arguing with Appellant, asking him why he had shot Perez. He then took Appellant's gun from him and left it at the park.

After they dropped Appellant off at his house and returned to the Cantu home, Christina warned Carmen that she could not leave. Fearing for her life, Carmen initially remained at the house. At some point, Carmen went to her parents' home but did not report the murder to law enforcement, believing Christina and Manuel might kill her if she did. At Christina's insistence, Carmen returned to the Cantu home and saw the garage had been cleaned and her belongings taken away. Christina told Carmen she had the car they used to transport Perez's body cleaned and detailed.

## B.   The police investigation

One of Christina and Manuel's neighbors called 911 at approximately 1:47 a.m. on February 23, 2019, to report hearing six to eight shots fired nearby. At approximately 3:14 a.m., another individual called to report Perez's body on the side of a nearby street. The responding officer reported that the neighborhood is in a "high-crime area" for drugs and shootings.

An autopsy revealed that Perez suffered five gunshot wounds—two to his lip and chin, and three to his shoulder and upper torso. The medical examiner testified that one bullet pierced Perez's right lung and another went through both lungs, his esophagus, and his heart. He opined that "collectively," all five gunshot wounds killed Perez, and he reported that Perez also had multiple abrasions, contusions, and lacerations all over his body.

On February 27, 2019, a detective conducting an unrelated surveillance operation of a suspected drug house saw a female, later identified as Christina, engage in what he believed was a narcotics purchase. As Christina left, the detective contacted a patrol unit to follow her. After the

4

patrol officers observed her run a stop sign, they followed her to the Cantu home. When Christina exited the vehicle to open the residence gate, the officers approached the vehicle and saw Manuel in the passenger seat, drug paraphernalia in plain view, and "little baggies that are commonly used to package small narcotics." Christina was arrested for running the stop sign, driving without a valid license, and possession of drug paraphernalia. A search of the house revealed methamphetamine and heroin. Christina—in what the officers believed was an attempt to help herself—revealed she had "information" about a murder at the house involving Manuel and his brother.

Carmen, who was in the house at the time, was arrested on an outstanding warrant for a parole violation. The officers took her, Christina, and Manuel to the police station to be interviewed. At the station, Carmen provided a statement to a detective that implicated Appellant in Perez's murder.[6]

Appellant was arrested on February 28, 2019, and brought to the police station for a recorded interview. Appellant initially denied he was at the Cantu home at the time of the shooting. But after over an hour of questioning, Appellant admitted he shot Perez although he claimed he was defending Manuel, as the two were fighting and he believed Perez had a knife. Appellant later admitted he did not actually see the knife, but he nevertheless believed Manuel's life was in danger.

Appellant moved to suppress the statements he made during the interview, arguing he did not knowingly and intelligently waive his right to remain silent. Following a hearing at which the interviewing detective testified, the trial court denied the motion.

---

[6] Her statement was not introduced in evidence at trial, as the detective who took her statement was unavailable at trial to authenticate it. However, defense counsel cross-examined Carmen at length regarding contradictions that existed between her statement to the detective and her trial testimony.

## C. Appellant's conviction

Appellant was indicted on May 21, 2019, for the offense of capital murder for remuneration in Perez's death.[7] At trial, Appellant claimed he acted in defense of Manuel and denied receiving remuneration for the killing.[8] At Appellant's request, the trial court gave the jury an instruction allowing it to acquit Appellant if it found that he had shot Perez in Manuel's defense. At the State's request—and without objection—the court instructed the jury that if it did not find him guilty beyond a reasonable doubt of capital murder for remuneration, it could find him guilty of the lesser-included offense of first-degree murder.

The jury acquitted Appellant of capital murder for remuneration but found him guilty of first-degree murder. The trial court sentenced him to 70 years in prison. This appeal followed.

## II. THE MOTION TO SUPPRESS

In Issue One, Appellant contends the trial court abused its discretion by denying his motion to suppress his statements during his custodial interrogation on the ground that they were not freely and voluntarily made due to his use of methamphetamine and muscle relaxants, as well as his PTSD.

### A. Standard of review

An appellate court applies a bifurcated standard of review when evaluating a trial court's ruling on a motion to suppress. *Monjaras v. State*, 664 S.W.3d 921, 926 (Tex. Crim. App. 2022). "We afford almost total deference to a trial court's determination of historical facts if supported by the record, especially when the factfinding is based on an evaluation of credibility and

---

[7] A person commits the offense of capital murder, if, among other things, "the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration." Tex. Penal Code Ann. § 19.03(a)(3).

[8] Both Christina and Manuel were also charged in Perez's murder, but the State did not charge Carmen, believing she had no role in the matter and was merely the babysitter. Carmen was later given immunity for her testimony to ensure her presence at trial.

demeanor." *Id*. We recognize that the trial court observes firsthand the demeanor and appearance of witnesses, and is therefore best positioned to evaluate witness credibility and assess the weight to be given to witness testimony. *See Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). However, we conduct a de novo review of a trial court's application of law to facts. *Monjaras*, 664 S.W.3d at 926. In conducting our review, we "view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case." *Id*. (quoting *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019)). However, if evidence is conclusive, such as indisputable video evidence, we may disregard any trial court findings inconsistent with the conclusive evidence. *Id.* (citing *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012)).

### B. Applicable law on voluntariness

Code of Criminal Procedure Article 38.21 provides: "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." Tex. Code Crim. Proc. Ann. art. 38.21. Significant to this appeal, a defendant may claim that his statements were not freely and voluntarily made under Article 38.22 (the confession statute). *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (citing Tex. Code Crim. Proc. Ann. art. 38.22). The confession statute provides that "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." Tex. Code Crim. Proc. Ann. art. 38.22(6).

"A confession can be involuntary under state law if the suspect lacked the mental capacity to understand his rights or if, due to a temporary mental condition, he did not understand what he was confessing to." *Sandoval v. State*, 665 S.W.3d 496, 526 (Tex. Crim. App. 2022), *cert. denied*, 144 S.Ct. 1166 (2024). Relevant here, a trial court may consider such factors as whether the

7

defendant was ill or intoxicated at the time of his interview. *See Oursbourn*, 259 S.W.3d at 172–73; *Leza v. State*, 351 S.W.3d 344, 352–54 (Tex. Crim. App. 2011). However, while relevant to a voluntariness inquiry, such factors "are usually not enough by themselves to render a statement inadmissible under Article 38.22." *See Leza*, 351 S.W.3d at 352; *see also Sandoval*, 665 S.W.3d at 526 (recognizing that "youth, intoxication, mental retardation, and other disabilities are usually not enough, by themselves, to render a statement inadmissible").

If a statement is found to be involuntary under the confession statute, we must next determine whether the statement's admission harmed the defendant, using the harm analysis for non-constitutional errors, which provides that a court must disregard an error if it did not affect the defendant's substantial rights. *Sandoval*, 665 S.W.3d at 515, 527 (citing Tex. R. App. P. 44.2(b)). A "substantial right is affected only if the error had 'a substantial and injurious effect or influence' on the jury's verdict." *Id.* at 515–16 (quoting *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018)). "Stated another way, a substantial right is not affected if the appellate court has 'fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect.'" *Id.* (quoting *Gonzalez*, 544 S.W.3d at 373).

### C. Analysis

During trial, Appellant moved to suppress the statements he made during his interview, arguing, among other things, that they were not voluntarily made under the confession statute. During his recorded interview, Appellant said he used methamphetamine the night before, and he contended he did not appear "oriented" during the interview as a result. At Appellant's request, the trial court held a hearing to view the recorded interview and hear testimony from Detective Carreon regarding his impressions of Appellant's state of mind at that time.

At the start of the interview, Detective Carreon advised Appellant that he was under arrest and read Appellant his Miranda rights. When asked if he understood his rights, Appellant stated

8

yes. During the hearing, Detective Carreon expressed his opinion that Appellant "made a choice to speak to [him.]" Detective Carreon testified that he did not recall if Appellant appeared "intoxicated" at the time of his interview. But he did acknowledge asking Appellant if he wanted any water. On the recording he stated that it sounded as if Appellant had "cotton mouth." As the trial court recognized, during the interview, Appellant informed the detective that he had taken a "hit" of methamphetamine the night before, but he did not specify when he had taken it.

After the hearing, the trial court found that the interrogation complied with the requirements of the confession statute, as it was recorded, the detective provided Appellant with appropriate warnings, and Appellant "knowingly, intelligently and voluntarily waived the rights set out in the warning" by acknowledging that he understood them. The court further found that Appellant made sense during the interview and was able to coherently respond to Detective Carreon's questions. Although the judge acknowledged Appellant's statement that he had taken methamphetamine sometime prior to the interview, after "listening to the evidence," he did not believe Appellant was intoxicated, or if he was, his intoxication did not rise to the level that would render his statements involuntary. The court therefore concluded Appellant's statements were voluntary, such that they were admissible under the confession statute. The parties agreed not to show the jury the video recording, as Appellant was in handcuffs during the interview. Instead, the State only played the audio portion of the interview for the jury.[9]

Appellant challenges the trial court's decision to admit the recording, contending the "totality of the circumstances" made it clear that his statements could not have been made voluntarily given his "state of intoxication and fatigue," which he contends rendered him "incapable of knowingly and intelligently waiving the privilege against self-incrimination."

---

[9] In addition, at Appellant's request, the trial court made certain redactions from the recording before it was played for the jury. Those redactions are not in question in this appeal.

Specifically, he asserts that the recording revealed Appellant was suffering from PTSD, was on "muscle relaxants" at the time of his interrogation, admitted to being a "meth user," and appeared to be falling asleep, at one point nearly falling off his chair.

Although the record does not contain the visual portion of the interview, and although Detective Carreon denied seeing Appellant almost fall out of his chair, we will assume for purposes of the appeal that Appellant's description of his appearance on the recording is accurate. Making that assumption, and assuming Appellant took narcotics prior to the interview, these factors standing alone do not convince us that the trial court abused its discretion in finding that Appellant's statements were voluntarily and knowingly made.

In a similar situation, the Court of Criminal Appeals rejected a defendant's claim that the trial court abused its discretion in finding that his confession was not involuntary where he claimed that he was both sleep-deprived and intoxicated from the use of narcotics. *Sandoval*, 665 S.W.3d at 526–27. In *Sandoval*, the court held that the fact-finder was free to conclude that the defendant possessed the requisite mental state to make a voluntary confession—even if he was tired and under the influence of drugs—where he was able to acknowledge that he understood his rights and agreed to waive them, and he was able to articulate his "version of events" to support his self-defense theory. *Id.* The court held that under those circumstances, the trial court was "well within its discretion to conclude that Appellant was not suffering from a mental condition that would have caused his statement, or his waiver of rights, to be involuntary." *Id.* at 527; *see also Leza*, 351 S.W.3d at 352–54 (concluding the court did not abuse its discretion in finding defendant's statements were voluntary under the confession statute, where the trial court reviewed the recording of his interview and determined that the defendant did not appear impaired in his judgment or decision-making ability, despite his claim that he was under the influence of heroin); *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996) (record supported trial court's finding

10

that defendant was capable of voluntary confession despite written statement that he was drinking at the time of arrest).

Here, too, we find nothing in the record that would suggest the trial court abused its discretion in finding that—despite Appellant's contentions—he was capable of voluntarily and knowingly waiving his rights, and he was able to coherently respond to the detective's questions throughout the interview. Accordingly, we conclude that the trial court acted within its discretion in denying Appellant's motion to suppress.

Appellant's Issue One is overruled.

## III. ACCOMPLICE AND REQUEST FOR AN ACCOMPLICE INSTRUCTION

In Issue Two, Appellant contends the trial court abused its discretion in refusing to find that Carmen was an "accomplice" in Perez's murder and refusing to give an "accomplice instruction" which would have instructed the jury that it could not convict him based solely on Carmen's uncorroborated testimony.

### A. Applicable law

Texas Code of Criminal Procedure Article 38.14 states "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14; *see also Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (recognizing that the state legislature enacted Article 38.14 because "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person").

A witness can be an accomplice as a matter of fact or as a matter of law. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017). Whether a defendant is entitled to an accomplice-

witness instruction is a function of the evidence produced at trial. *Id.* (citing *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013)).

A witness may be an accomplice as a "matter of law" in three situations: (1) "If the witness has been charged with the same offense as the defendant or a lesser-included offense"; (2) "If the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant"; and (3) "When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice." *Id.* at 886. If a witness is an accomplice as a matter of law, the trial court must "affirmatively instruct[] the jury that the witness is an accomplice and that his testimony must be corroborated." *Zamora*, 411 S.W.3d at 510 (citing *Druery v. State*, 225 S.W.3d 491, 498–99 (Tex. Crim. App. 2007)).

But when there is conflicting or inconclusive evidence regarding the witness's complicity, "then the accomplice-witness instruction asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined that the witness is an accomplice." *Id.*; *see also Smith*, 332 S.W.3d at 439–40 (recognizing that "[w]hen there is doubt as to whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct the jury to determine a witness's status as a fact issue"). However, "when the record clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice witness rule—as a matter of law or fact." *Smith*, 332 S.W.3d at 440 (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)).

## B. Standard of review

An appellate court analyzes a jury-charge issue under the standards set forth in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc). *See Zamora*, 411 S.W.3d at 512 ("[T]he procedural framework of *Almanza* applies to accomplice-witness instructions, both as a

matter of law and as a matter of fact[.]"); *see also Castillo v. State*, No. 04-22-00557-CR, 2024 WL 697099, at *7 (Tex. App.—San Antonio Feb. 21, 2024, no pet.) (mem. op., not designated for publication) (recognizing same). The initial question in analyzing a jury-charge issue under *Almanza* is whether the charge contains error. *Castillo*, 2024 WL 697099, at *7 (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). If the charge contains error in the omission of an accomplice-witness instruction, we analyze that error for harm. *Id*. (citing *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012)). "The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection." *Id*. (quoting *Ngo*, 175 S.W.3d at 743). When, as here, the appellant preserved error by requesting an accomplice instruction, an error in refusing to give the instruction requires us to reverse if we find "some harm." *Id.* Error is harmless under this standard when the corroborating evidence is so strong that "it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense." *Id.* at *8 (quoting *Casanova*, 383 S.W.3d at 539–40). When evaluating the sufficiency of corroborating evidence, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The tends-to-connect standard does not present a high threshold because the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.* "Rather, the evidence simply must link the accused in some way to the commission of the crime[.]" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *see also Simmons v. State*, 282 S.W.3d 504, 509 (Tex. Crim. App. 2009) (recognizing that the issue is whether "a rational fact-finder could conclude that the non-accomplice evidence 'tends to connect' appellant to the offense").

### C. Analysis

#### (1) Carmen was not an accomplice witness.

The first step in our analysis is to determine whether Carmen was an accomplice as a matter of law or fact. The trial court correctly concluded that she was neither.

Carmen cannot be considered an accomplice as a matter of law under the first two prongs of the *Ash* test, as there is no evidence that Carmen was ever indicted in relation to Perez's killing, or that the State offered her immunity based on an agreement to dismiss any such charges. To the contrary, law enforcement decided not to charge Carmen with any offense, as they believed she was only present at the scene of the killing as a bystander, and the State only offered her immunity to secure her attendance at trial.

Appellant, however, contends we should look to the third prong of the *Ash* test and conclude that the facts establish Carmen was an accomplice and that no rational juror could conclude otherwise. Appellant points out that Carmen admitted she was present when Christina formulated her plan to hire Appellant to kill Perez; that she was with Christina when she picked up Appellant in furtherance of the plan; that she was present when the shooting occurred; that she admittedly assisted Appellant and Manuel with cleaning up the crime scene; and that she was with them when they disposed of Perez's body. None of these factors, however, supports a finding that Carmen was an accomplice to Perez's murder.

An accomplice to an offense is a person who participates in the offense before, during, or after its commission with the requisite mental state. *Smith*, 332 S.W.3d at 440 (citing *Druery*, 225 S.W.3d at 498). However, mere presence at the crime scene does not make a person an accomplice; to the contrary, "an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Id.* (citing *Druery*, 225 S.W.3d at 498). A person is not an accomplice merely because the person knew about the offense and failed to

14

disclose it or helped to conceal it. *Id.* (citing *Gamez*, 737 S.W.2d at 322); *see also Druery*, 225 S.W.3d at 500 (the mere presence of two witnesses at the scene of the crime did not render them accomplice witnesses, nor did the fact that they "knew of the planned offense but did not disclose it"); *Zuniga v. State*, 393 S.W.3d 404, 414 (Tex. App.—San Antonio 2012, pet. ref'd) (rejecting defendant's claim that witness could be considered an accomplice for failing to take steps to prevent victim's murder).

In addition, a person may not be considered an accomplice merely because he engaged in conduct after the fact that assisted the defendant in concealing the offense. To be considered an accomplice to a murder, a witness must be "susceptible to prosecution for the murder itself by having affirmatively assisted in committing the offense." *Druery*, 225 S.W.3d at 500 (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004)); *see also Kunkle v. State*, 771 S.W.2d 435, 441 (Tex. Crim. App. 1986) (en banc) ("In the absence of such an [affirmative] act, he cannot be an accomplice witness, even as a matter of fact."). That a witness may have assisted the defendant with concealing his crime after the fact does not render him susceptible to prosecution for the murder itself. *Id.* Thus, "acting only as an accessory after the fact—in essence, playing no part in the offense, but helping to cover it up once it has been committed and completed—does not alone suffice to make a witness an accomplice, at least not to the offense that is covered up." *Ruffins v. State*, 666 S.W.3d 636, 647 (Tex. Crim. App. 2023); *see also Castillo*, 2024 WL 697099, at *7–8 (recognizing that witness could not be considered an accomplice as a matter of law based on helping clean the crime scene and dispose of the victim's body, but a jury question existed regarding whether she could be considered an accomplice as a matter of fact where evidence indicated she may have participated in the murder itself); *Druery*, 225 S.W.3d at 500 (helping dispose of body and murder weapon after the fact did not render witness an accomplice for purposes of requiring an accomplice instruction); *Delacerda v. State*, 425 S.W.3d

367, 395–96 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (witnesses who only assisted the defendant with disposing of victims' bodies could not be considered accomplice witnesses, as they were not subject to prosecution for the murder itself).

Here, while the record reflects Carmen was present during the planning and commission of Perez's murder, and even assisted in cleaning the crime scene, nothing in the record supports a finding that she participated in the murder itself, such that she would be susceptible to prosecution for the same. Accordingly, we conclude that Carmen could not be considered an accomplice witness, either as a matter of law or fact.

### (2) Appellant's confession corroborated Carmen's testimony.

Even if we concluded that Carmen could be considered an accomplice witness, we would still be required to examine the record to determine if Appellant was harmed by the trial court's failure to give an accomplice instruction. Appellant contends he was harmed by the failure, arguing the record contains no evidence to corroborate Carmen's testimony. He points out that the State did not present any physical evidence to link him to the crime and no other witnesses testified at trial to his involvement in the shooting. However, Appellant's own confession, which we have deemed voluntary, corroborates Carmen's testimony.

It is well-established that "[a] defendant's confession may be sufficient to corroborate the testimony of an accomplice, if proof of the confession does not depend upon the testimony of the accomplice." *Lopez v. State*, No. 04-11-00487-CR, 2012 WL 3731731, at *5 (Tex. App.—San Antonio Aug. 29, 2012, pet. ref'd) (mem. op., not designated for publication) (citing *Ex Parte Martinez*, 3030 S.W.3d 891, 894 n.4 (Tex. Crim. App. 2011)); *see also Snyder v. State*, 68 S.W.3d 671, 677 n.5 (Tex. App.—El Paso 2000, pet. ref'd) (recognizing same).

Here, Appellant's confession did not depend on Carmen's testimony; instead, Appellant admitted to shooting Perez, albeit in defense of his brother. This was sufficient to "connect" him

16

to the murder. *See Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) (accomplice testimony in murder prosecution was adequately corroborated by appellant's judicial confession that he killed the victim, even though he claimed that he acted in self-defense); *Lopez*, 2012 WL 3731731, at *3–5 (defendant's confession to law enforcement in which he admitted to shooting victim but claimed that he did so in self-defense was sufficient to corroborate accomplice's testimony).

We therefore conclude that Appellant's statements to police admitting to the shooting were sufficient to corroborate Carmen's testimony. Accordingly, any possible error in failing to provide the jury with an accomplice-witness instruction would did not constitute reversible error.

Appellant's Issue Two is overruled.

## IV. SUFFICIENCY OF THE EVIDENCE

In Issue Three, Appellant contends there was legally insufficient evidence to support his conviction for first-degree murder, asserting that no rational jury could have rejected his claim of defense of a third person.

### A. Applicable law

A person commits first-degree murder if, among other things, he "intentionally or knowingly causes the death of an individual[.]" *See* Tex. Penal Code Ann. § 19.02(b)(1). However, the accused has a defense to prosecution if he was justified in using deadly force against his victim in self-defense or in defense of another person. *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018) (citing Tex. Penal Code Ann. § 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter.")). "[J]ustification, by definition, does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct." *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

17

Penal Code § 9.33 provides:

"A person is justified in using force or deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person."[10]

Tex. Penal Code Ann. § 9.33.

In interpreting this Code provision, "a defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself." *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016). Thus, "the focus of the defense-of-third-persons defense is upon what the actor reasonably believes concerning the situation of the third person." *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011); *see also Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986) ("So long as the accused reasonably believes that the third person would be justified in using deadly force to protect himself, the accused may step in and exercise deadly force on behalf of that person."). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. Tex. Penal Code Ann. § 1.07(a)(42).

When a defendant raises "a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce

---

[10] Section 9.32 uses almost identical language providing that:

    (a) A person is justified in using deadly force against another:
      (1) if the actor would be justified in using force against the other under Section 9.31; and
      (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
        (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
        (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Tex. Penal Code Ann. § 9.32(a)(1)(2).

18

evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (en banc)). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Id*. (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). Once such evidence is adduced, the defense and reasonableness of his use of force could be an issue for the jury. *See Henley*, 493 S.W.3d at 94 (recognizing that a defendant has the initial burden to come forward with evidence that would support his claim of defense of others before the matter can be considered a question of fact for the jury, and before he is allowed to an instruction on the defense). The burden then shifts to the State to "present evidence sufficient to support a finding beyond a reasonable doubt that the defendant committed each of the essential elements of the crime and did not act in self-defense." *Santos-Garcia v. State*, No. 08-13-00324-CR, 2017 WL 5899176, at *6 (Tex. App.—El Paso Nov. 30, 2017, no pet.) (not designated for publication); *see also Braughton*, 569 S.W.3d at 608–09 (recognizing that the State's burden in a case of self-defense or defense of a third party "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt"). In assessing a defendant's claim of self-defense or defense of others, the jury may consider the totality of the circumstances leading up to, during, and after the use of force. *Santos-Garcia*, 2017 WL 5899176, at *6.

The jury implicitly rejects the defendant's self-defense or defense-of-others theory when it finds the defendant guilty beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 609 (recognizing that a "jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory"); *see also Valverde v. State*, 490 S.W.3d 526, 527–28 (Tex. App.—San Antonio 2016, pet. ref'd)

19

(recognizing that when a jury finds the defendant guilty, it implicitly finds against any defensive theory raised by the defendant).

## B. Standard of review

In considering a challenge to the legal sufficiency supporting a jury's rejection of a defendant's claim that he acted in defense of others, the test is whether "any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the [defensive] issue beyond a reasonable doubt." *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (en banc) (quoting *Saxton*, 804 S.W.2d at 914; *see also Valverde*, 490 S.W.3d at 528 (recognizing same in the context of a self-defense claim). In a review of this nature, a jury's rejection of a defendant's affirmative defense "should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and 'no reasonable [fact-finder] was free to think otherwise.'" *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

As with any legal sufficiency challenge, we view the evidence "in the light most favorable to the verdict," and we recognize that because the jury is the "sole judge of the witnesses' credibility and the weight to be given their testimony," we must defer to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 899–900, 902 (Tex. Crim. App. 2010). As the sole judge of a witness's credibility, "the jury can believe all, some, or none of a witness's testimony." *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony."). We therefore may not re-evaluate credibility or the weight of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Thornton v. State*,

425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (holding that a reviewing court should not act as a "thirteenth juror" by overturning a jury's credibility and weight determinations).

"This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). And because it is firmly within the jury's province to resolve conflicts in testimony, we must therefore presume the jury resolved any conflicting inferences in favor of the verdict. *See Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319).

### C. Analysis

Here, the trial court determined that Appellant produced sufficient evidence to warrant a defense-of-others jury instruction, and it therefore instructed the jury that it could acquit Appellant of Perez's murder if it determined that he acted in defense of his brother. Appellant contends the evidence was legally insufficient to support the jury's implicit rejection of his defense. Appellant points out that the only witness who contradicted his defensive theory was Carmen, whom he describes as a "confused accomplice witness," pointing out that she is a methamphetamine user who sometimes hallucinates, that she was unable to remember certain details of the events surrounding the shooting, and that she provided inconsistent statements to law enforcement. According to Appellant, Carmen's testimony was not credible and was so inherently contradictory that no rational juror could have believed her version of the events.

As the State points out, however, while Carmen may have been inconsistent in recalling certain details of the events both before and after the shooting, she was entirely consistent in reporting the significant details supporting a finding that Appellant acted intentionally and knowingly when he shot Perez. She never wavered in her testimony regarding Appellant planning

21

Perez's murder with Christina, and Appellant shooting Perez in accordance with the plan. Although Carmen admitted using methamphetamine at various times, including after the murder, which sometimes caused her to hallucinate, she testified that she did not use the night of the murder until after the killing took place and that her recollection of the shooting was not a "drug induced thing."[11] While there were weaknesses in Carmen's testimony, those weaknesses were not so significant that it would have been irrational for the jury to find her testimony credible and believe her version of the events, rather than Appellant's claim that he acted in Manuel's defense when he shot Perez. *See Braughton*, 569 S.W.3d at 611–12 (although appellant pointed to "numerous weaknesses in [the witness's] testimony, those weaknesses were not so significant that they rise to the level of establishing that it would have been irrational for the jury to credit any part of her testimony whatsoever," and the jury was therefore free to believe her testimony that the defendant acted intentionally in shooting his victim and reject the defendant's self-defense claim).

Moreover, though Appellant did not testify at trial, the jury had before it the recorded statements Appellant made during his interrogation in which he first raised his defense-of-another claim. But as the State points out, a rational jury could have found his version of the events not credible given the evasive nature of his initial answers to law enforcement and his own inconsistent statements; for example, he initially denied being present at the shooting then later admitted to shooting Perez, and he first claimed he saw Perez with a knife but subsequently admitted he did not. *See Saxton*, 804 S.W.2d at 913–14 (assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"); *Smith v. State*, 355 S.W.3d 138, 146–147 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (recognizing that the jury was free to disbelieve defendant's claim that he stabbed his victim in self-defense or

---

[11] On cross-examination, Carmen acknowledged that upon her arrest she may have told law enforcement she had been using methamphetamine at the time of the shooting, but she could not recall. We do not find that this possible inconsistency in her statements rendered the remainder of her testimony unbelievable.

22

in defense of others); *see also Barron v. State*, 630 S.W.3d 392, 404 (Tex. App.—Eastland 2021, pet. ref'd) (recognizing that a claim of self-defense that is based solely on the defendant's statements constitutes a credibility determination for the jury to resolve).

In addition, the jury could have found that Appellant's defensive claim was undermined by the fact that he shot Perez multiple times, and rather than calling law enforcement, he and his brother concealed the murder by moving Perez's body away from the crime scene, disposing of Appellant's gun at a nearby park, and changing out of their blood-stained clothing at the park before returning to their respective homes. *See Smith*, 355 S.W.3d at 146–147 (recognizing that defendant's flight from the scene of the victim's killing "undermined" his defensive claims that he acted in self-defense or in defense of others) (citing *Miller v. State*, 177 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (finding that flight of defendant, who claimed self-defense, immediately after shooting and his attempts to hide evidence constituted circumstantial evidence of his guilt)); *see also Gonzalez v. State*, No. 08-14-00293-CR, 2019 WL 1553583, at *8 (Tex. App.—El Paso Apr. 10, 2019, pet. ref'd) (not designated for publication) (jury could infer defendant's intent to commit murder and reject his claim of self-defense from the nature of the victim's injuries and evidence of his flight from the crime scene).

Ultimately, this case boils down to a contest of credibility between Carmen and Appellant. We find nothing in the record to suggest that the jury's implicit choice of believing Carmen's version of the events and rejecting Appellant's defensive claim was not rationally based. *See Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009) (where the record allows for more than one reasonable inference, "[a]s long as the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable"). Accordingly, viewing the record in the light most favorable to the jury's verdict, as we must, we conclude that the evidence was legally sufficient to support Appellant's conviction for first-degree murder.

Appellant's Issue Three is overruled.

## V. MOTION FOR MISTRIAL

In his fourth and final issue, Appellant contends the trial court abused its discretion in denying his request for a mistrial after Perez's mother began crying in the courtroom during Carmen's testimony describing the attack on her son.

### A. Standard of review and applicable law

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard, and we will uphold the court's ruling "if it was within the zone of reasonable disagreement." *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010).

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). Only in extreme circumstances where the prejudice is incurable will a mistrial be required. *Id.*; *see also Martinez v. State*, 276 S.W.3d 75, 78 (Tex. App.—San Antonio 2008, pet. ref'd). When a bystander or a witness makes an outburst that interferes with the trial, reversible error results only when the defendant can show a reasonable probability of interference with the jury's verdict. *Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988) (en banc); *see also Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (recognizing same). We measure the injury occurring from an outburst on a case-by-case basis. *See Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985) (en banc).

"In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions." *Coble*, 330 S.W.3d at 292; *see also Gamboa*, 296 S.W.3d at 580 (recognizing that "[i]nstructions to the jury are generally considered sufficient to cure improprieties that occur

24

during trial[,]" and absent evidence to the contrary, an appellate court generally presumes that the jury will follow the court's instructions).

## B.   Analysis

On the first day of trial, Carmen was describing the beating Manuel inflicted on Perez, testifying that "there was blood everywhere," when Perez's mother, who was in the gallery but not listed as a witness, began crying. Defense counsel requested a mistrial, or in the alternative, an instruction to disregard the mother's "outburst." The trial court acknowledged the sobbing "could be heard from the bench" but stated he would not "classify it as an outburst." The court noted that the State had already escorted the mother and other family members from the courtroom, and the State had "good control" of the victim's family. The court denied the mistrial request but granted the curative-instruction request, directing the jury to "please disregard any outbursts you might hear from the gallery."

Appellant raises no issue with the nature of the instruction the court provided, but he argues the instruction was not sufficient to cure the prejudice resulting from the mother's "outburst," and the trial court should have granted his request for a mistrial. Appellant finds it significant that Perez's mother began crying at a "particularly egregious moment in the trial" when Carmen was describing the violent and bloody nature of Manuel's attack on Perez. Appellant contends the mother's "outburst" at this critical time could have influenced the jury to "give more credence to [Carmen's] version of events that [Perez] was not a threat to Manuel," thereby prejudicing Appellant's central claim that he was acting in Manuel's defense. But the emotional "outburst" did not include an opinion regarding defendant's guilt or his defensive claim. *See Ashley v. State*, 362 S.W.2d 847, 853 (Tex. Crim. App. 1962) (holding that an emotional "outcry" made by victim's widow during defendants' closing argument did not express an opinion on the defendants' claim

that they shot the victim in self-defense and did not warrant a mistrial, as her outcry "had no bearing" on the defendants' claim).

Moreover, it appears that the mother's outburst was handled immediately, resulting in only a momentary delay in the trial. We therefore cannot say that it "reasonably could have interfered with the jury's verdict." *Landry*, 706 S.W.2d at 112 (finding no abuse of discretion in denying defendant's request for mistrial where murder victim's wife, who was in the gallery, fainted during final argument, which prompted a non-verbal "outcry" from the victim's brother, as the defendant failed to demonstrate how the outburst "reasonably could have interfered with the jury's verdict"); *Miles v. State*, No. 06-21-00120-CR, 2022 WL 837961, at *1–2 (Tex. App.—Texarkana Mar. 22, 2022, no pet.) (mem. op., not designated for publication) (concluding that the trial court did not abuse its discretion in instructing the jury to disregard and denying request for mistrial where victim's mother, who was in the courtroom gallery, began "wailing" when the State showed graphic autopsy photographs of her son, but made no verbal comments for the jury to hear, and immediately exited the courtroom).

We find nothing in the record to suggest that the mother's brief emotional outburst was so prejudicial that it could not have been cured by the trial court's instruction to disregard, thereby making the more extreme remedy of a mistrial unnecessary.[12] *See Cruz-Banegas v. State*, No. 05-21-00256-CR, 2022 WL 2255724, at *4–6 (Tex. App.—Dallas June 23, 2022, pet. ref'd)

---

[12] Appellant cited only one case in which an appellate court held that a trial court abused its discretion in failing to grant a mistrial based on a witness's outburst during trial. *See Stahl v. State*, 749 S.W.2d 826, 829 (Tex. Crim. App. 1988) (en banc). We find that case entirely distinguishable. In *Stahl*, the Court of Criminal Appeals agreed with the defendant that the State had engaged in "misconduct" when it called the victim's mother to the stand, over the defendant's objection, to identify her son in an autopsy photo, despite knowing she was likely to be a "highly emotional witness," and even though her testimony was not needed to make the identification. *Id.* at 829–30. Although the trial court expressly admonished her to avoid an outburst, the mother began sobbing during her testimony and stated she hoped the defendant would "burn in hell." *Id.* at 830. Moreover, the State later alluded to her outbursts during closing arguments in calling for the defendant's conviction, despite the defendant's repeated objections and the trial court's rulings in the defendant's favor, convincing the court that the prosecutor desired "to use the outburst for inflammatory purposes." *Id.* Here, there is no allegation that the State was complicit in Perez's mother's outburst, and the record does not reflect that the State sought to use her outburst for any inflammatory purpose.

(mem. op., not designated for publication) (trial court did not abuse its discretion in denying motion for mistrial where victim's mother began crying during her testimony but was able to compose herself and where an instruction to disregard—if requested—would have cured any potential prejudice). Courts have found no abuse of discretion in a trial court's decision to deny a mistrial in the face of more extreme courtroom disruptions involving verbal attacks against a defendant.[13]

Finding nothing in the record to suggest a reasonable probability that Perez's mother's brief emotional outburst interfered with the jury's verdict, or that any resulting prejudice was not cured by the trial court's instruction to disregard, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial.

Appellant's Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

July 31, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

---

[13] *See, e.g.*, *Coble*, 330 S.W.3d at 291 (trial court did not abuse its discretion in denying request for mistrial where two of the victim's family members had outbursts in the courtroom involving crying and directing "expletives" at the defendant); *Diamond v. State*, 496 S.W.3d 124, 145 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (finding no abuse of discretion in denying request for mistrial following episode in which the victim's brother began crying on the stand when viewing his brother's autopsy photo and called the defendant a "son of a bitch," where there was no reasonable probability that the outburst interfered with the jury's verdict).